**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jun 17 2013, 8:34 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOANN M. PRICE**
Merrillville, Indiana

ATTORNEYS FOR APPELLEE:

**EUGENE M. VELAZCO, JR.**
DCS, Lake County Local Office
Gary, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE | ) | |
| TERMINATION OF THE PARENT-CHILD | ) | |
| RELATIONSHIP OF: | ) | |
| C.L.F., D.K.F. & C.S.F. (Minor Children) | ) | |
| And, | ) | |
| M.F. (Father) & C.J.F. (Mother), | ) | |
| | ) | |
| Appellants-Respondents, | ) | |
| | ) | |
| vs. | ) | No.  45A03-1210-JT-416 |
| | ) | |
| THE INDIANA DEPARTMENT OF | ) | |
| CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT, JUVENILE DIVISION
The Honorable Mary Beth Bonaventura, Judge
Cause Nos. 45D06-1202-JT-12
45D06-1202-JT-13
45D06-1202-JT-14

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

In this termination of parental rights appeal, the evidence demonstrated that Mother refused to believe that Father had repeatedly molested two of their three children, C.F. and D.F., (collectively, the Children) and one of his stepchildren, R.M., even though the allegations were substantiated and criminal charges had been filed against Father.

Father claims that his due process rights were violated because he was not transported to the termination hearing from the county jail, was not properly served with the notice of the hearing, and was not appointed counsel by the juvenile court. However, the evidence demonstrated that Father took no action to secure his presence at the hearing, seek counsel, or request a continuance.

The evidence further established that the appellee-petitioner, Indiana Department of Child Services (DCS), proved that there was a reasonable probability that the conditions that resulted in the Children's removal and that continuation of the parent-child relationship were not remedied. The DCS also showed that termination of parental rights was in the Children's best interest and that the DCS had a satisfactory plan for the care of the Children—namely adoption by the maternal grandmother. Thus, we affirm the judgment of the juvenile court.

FACTS

On July 27, 2010, the DCS was notified about an incident of Father's sexual abuse that involved one of Mother's children, R.M., who lived with the Parents and siblings M.M., age 15, J.R. age 10, C.F. age 9, D.F. age 8, and C.L.F. age 7.[1] R.M. was taken from Mother's care and custody that day, and the others were removed from the residence the following day.

In September 2010, R.M. disclosed to her relatives that Father had, in fact, been molesting her. R.M. indicated that the sexual abuse began when she was six years old and continued until she turned thirteen. R.M. reported details of the molesting to the DCS family case manager John Talley and to law enforcement officials about the allegations. Several of the other children reported that they had witnessed some of the incidents. R.M. participated in an interview where she again disclosed Father's molestation, including an incident when Father made her perform oral sex on him. During the interview, R.M. further disclosed that Father's friend, N.F., also abused her while Father watched.[2] R.M. and the other Children were subsequently placed in foster care based on concerns for the Children's safety in light of the sexual molestation allegations.

The juvenile court established a case plan for reunification with Mother and the Children. In particular, Mother was ordered to participate in parenting time, individual

---

[1] Father is R.M., M.M., and J.R.'s stepfather.

[2] The State filed criminal charges against N.F., which were pending at the time of the termination hearing. Tr. p. 78.

and family therapy, parenting classes, and was ordered to complete a psychological evaluation.

Father was charged with child molesting and is awaiting trial. However, Mother denied the allegations and accused R.M. of lying about the incidents. Throughout the proceedings, Mother continued to believe that her daughter lied about the sexual abuse allegations and has no plans to be away from Father. Thus, all of the children were removed in light of concerns for the Children's safety.

The family began a history with the DCS in 1998, 2000, 2004, and 2006. The previous cases involved educational neglect, poor hygiene involving the Children, child molestation, and instances of medical neglect. Three of these four previous cases were substantiated.

At a CHINS proceeding that commenced on July 29, 2010, the parents were ordered to participate in various services, including psychological examinations and treatments, family counseling, and parenting classes. In October 2011, DCS family case manager Tina Kozlowski filed a report alleging that Father had been molesting D.F. During an interview, D.F. claimed that Father had taken him into a private room on at least six occasions and performed anal sex on him. D.F. had been diagnosed with a mild mental disability and participated in an individualized educational plan at school. D.F. continued to wet and soil his pants and his physicians determined that the issue is not physical. D.F. participated in family, individual, and sibling group therapy. In fact, D.F. stated that he was afraid of Father.

4

Mother was very upset during the interview and stated there "was no way" that Father could have molested D.F. because Father worked seventy hours per week and was never home. Mother was convinced that R.M. had "swayed" D.F. to lie about the incident. Tr. p. 55-56. Kozlowski was concerned that Mother was defending Father because most parents are in a state of disbelief that this could happen to their child or would want the perpetrator in jail.

Father denied molesting D.F. and even denied ever being alone with the child. However, Father disclosed that he had inserted his fingers in D.F.'s anus several times because D.F. had become constipated and he had to loosen the child's stools.

Sometime in December 2011, C.F. alleged that Father had molested her as well. C.F. had been diagnosed with ADHD and takes medications to address that condition. C.F. reported that on one occasion, Father came into her bedroom when she was getting ready for bed and put his hand down the back of her panties and then moved his hand around to the front as he hugged her good night. At least one other incident occurred after this one. The children all receive therapy, but C.F., in particular, participates in specialized therapy to address the sexual abuse incidents and her anger issues. The children are doing well in school and their maternal grandmother, with whom the children were placed, satisfies their needs. In fact, the Children's maternal grandmother desires to adopt the Children.

Mother claims that she has a "healthy bond" with the Children, and she did not believe that terminating her parental rights was in the Children's best interests. In fact,

5

Mother believed that the Children being away from her had a negative impact on them. Tr. p. 116.

DCS Family Case Manager Dianna Garner believed that termination of parental rights was in the Children's best interests based on Mother's belief that Father was innocent, her refusal to believe the Children's reports, her inability to protect the Children in light of her refusal to believe them about the molestation incidents, and her refusal to take steps to protect them from Father or other sexual perpetrators in general. The DCS case managers also believed that additional services offered to the Parents would not assist them.

On May 5, 2011, the State filed six felony counts against Father that stemmed from the molestation of R.M. from July 2004 to July 2010, including two counts of child molestation, a class A and a class B felony. The State then filed additional molestation charges against Father for molesting D.F. and C.F. These charges included child molesting, a class A felony, and incest, a class B felony. The juvenile court suspended all parenting time between the Children and Father, and Father was ordered to participate in a sexual offender program.

On February 8, 2012, the DCS filed a petition to terminate the parental rights as to the Children. Thereafter, on August 22, 2012, the juvenile court conducted an evidentiary hearing on the termination petitions, where Mother appeared with counsel and Father did not appear in person or by counsel. Father was incarcerated in the Lake County Jail on the child molesting and incest charges.

6

DCS Family Case Manager Garner had been the family's case manager since July 29, 2010. Until Father was arrested in May 2011, he had cooperated with the services that DCS had offered and had participated in the individual therapy sessions. However, Father refused to participate in the court-ordered sex offender treatment program based on his counsel's advice in the pending criminal cases.

In an effort to move towards reunification, DCS personnel stressed to Mother that she needed to believe the Children and be willing to protect them. The DCS case managers had several child and family team meetings to review these goals. During one of these meetings in November 2011, the team members discussed a safety plan that included Father moving from the residence. The Parents indicated that, while Father would move out, he would just move back in once the case was closed. Family Case Manager Garner believed that Mother would permit Father to have contact with the Children and move back into the home.

Father discontinued individual therapy in December 2011 because he did not believe that it was helping. Father did not visit the Children because of no contact orders but participated in family therapy until that service was stopped after D.F. and C.F. had lodged the molesting allegations against him.

Mother continued to participate in individual and family therapy, underwent a psychological evaluation, took parenting classes, and exercised parenting time with the Children. At the time of the termination hearing, Mother was still participating in individual therapy and visitation with the Children. Laura Uzelac, who was mother's

7

therapist from August 2010 to May 2012, had a goal of convincing Mother to believe her Children and the allegations against Father. However, Mother rejected Uzelac's counseling and never considered that it was possible that Father abused R.J., D.F. and C.F. Uzelac was concerned that Mother's inability to believe her Children would prevent her from keeping them away from their abuser. Mother maintained her disbelief about Father's allegations through May 2012, believed that there was a conspiracy against the Parents, and was of the opinion that someone had brainwashed the Children. Mother's goal was to have Father released from jail so she could reunite the entire family. However, Uzelac has described Mother as having a "blind trust" for Father because she believed that he would never hurt any of the Children. Tr. p. 107-08.

On August 23, 2012, the juvenile court entered an order terminating Mother's and Father's parental rights as to all of the Children. The juvenile court found, among other things, that Mother made no efforts to protect her children and that the reunification services failed because of Mother's refusal to believe the allegations that had been made against Father.

The Parents now appeal.

DISCUSSION AND DECISION

I. Father's Due Process Rights, Generally

Father argues that his constitutional due process rights were violated because he was not properly served with notice of the termination hearing, was not appointed

8

counsel, could not present evidence or cross-examine witnesses at the termination hearing, and was not transported to the initial and fact finding hearings.

We initially observe that due process considerations in termination of parental rights proceedings involve the balancing of three factors; (1) the private interests affected by the proceedings; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. C.T. v. Marion County DCS, 896 N.E.2d 571, 586 (Ind. Ct. App. 2008). The private interests of a parent and the countervailing government interests are both substantial. Id. at 587. The standard for determining what due process requires in a juvenile proceeding is "fundamental fairness." In re M.T., 928 N.E.2d 266, 270-71 (Ind. Ct. App. 2010).

In addressing these claims, the record demonstrates that Father was served with notice of the termination hearing while he was incarcerated in the Lake County Jail. Although Father maintains that his due process rights were violated based on a failure to receive notice of the hearing, he only presents this issue in his "Issues Presented for Review" section of his appellate brief and does not further develop that claim. Appellant's Br. p. 12. As a result, Father has waived this contention. See Smith v. State, 822 N.E.2d 193, 202-03 (Ind. Ct. App. 2005) (observing that a party's failure to support contentions with citation to authorities, statutes, and parts of the record, results in waiver of the claims on review). Father has also failed to provide us with relevant documentation in support of his claims. Thus, Father has waived his claim on this basis, as well.

9

Finally, while Father asserts that his due process rights were violated because the juvenile court failed to appoint counsel in the underlying CHINS proceeding, the record does not support that argument because the orders from the detention hearing and initial hearing on July 29, 2010, indicate that the juvenile court advised the Parents of their right to counsel and neither requested the same. Father also did not contest the non-appointment of counsel during those proceedings. Even more compelling, the Parents retained private counsel who appeared with, and for the Parents, and filed various motions on their behalf. Under these circumstances, Father's contentions that his due process rights were violated, fail.

## II. Failure to Transport Father for Termination Proceedings

Father claims that the juvenile court's failure to transport him to the termination hearing from the Lake County Jail violated his due process rights because he was prevented from presenting evidence, cross-examining witnesses, or participating in the hearing. Appellant's Br. p 5, 10.

Father does not have a constitutional right to be physically present at the termination hearing. In re C.G., 954 N.E.2d 910, 922-23 (Ind. 2011). More specifically, in C.G., our Supreme Court stated that whether or not an incarcerated parent is permitted to attend a termination of parental rights hearing is within the juvenile court's sound discretion. In exercising that discretion,

> the trial court judge should balance the following factors: (1) The delay resulting from parental attendance; (2) the need for an early determination of the matter; (3) the elapsed time during which the proceeding has been

10

pending; (4) the best interests of the child(ren) in reference to the parent's physical attendance at the termination hearing; (5) the reasonable availability of the parent's testimony through a means other than his or her attendance at the hearing; (6) the interests of the incarcerated parent in presenting his or her testimony in person rather than by alternate means; (7) the [effect] of the parent's presence and personal participation in the proceedings upon the probability of his or her ultimate success on the merits; (8) the cost and inconvenience of transporting a parent from his or her place of incarceration to the courtroom; (9) any potential danger or security risk which may accompany the incarcerated parent's transportation to or presence at the proceedings; (10) the inconvenience or detriment to parties or witnesses; and (11) any other relevant factors.

Id. at 922-23.

In this case, the evidence shows that Father was aware, as of February 29, 2012, that the DCS was proceeding with terminating his parental rights. Father was served with a summons for the evidentiary hearing on May 21, 2012. The summons was not returned and Father did not request the juvenile court to: 1) be transported to the hearing; 2) appear for the hearing telephonically; 3) appoint counsel for him; or 4) grant a continuance. Father did not request any additional relief.

The evidence demonstrates that Mother notified Father's counsel in the criminal case about the conflict with the hearing dates, but his attorney never contacted Mother, the DCS, or the juvenile court. Tr. p. 21-22. Also, while Father had a scheduled hearing in his criminal matter on the same date as the termination hearing, the DCS observes that Father's procedural history in the criminal matter indicates that he appeared at the scheduled jury trial hearings on April 10, June 7, and August 22, 2012, and sought continuances of the matter. Two of these requests for continuances occurred after Father

11

received the summons in May 2012 regarding the August 22, 2012, termination hearing. Moreover, the record does not show that Father ever requested the criminal court to transport him to the termination proceedings.

In sum, it is apparent that Father took no action either to secure his personal or telephonic presence at the termination hearing, seek a continuance, or request any other relief. Father's explanations about the denials of the incidents of molestation were presented to the juvenile court through the testimony of both witnesses and documentary exhibits. Mother provided ample alternative explanations for the allegations, including coaching, medication, mental deficiencies, a conspiracy theory, and poor relations with maternal grandmother who wanted Father incarcerated. Father does not direct us to any evidence that would support a result that is contrary to the termination of his parental rights. As a result, we conclude that the juvenile court did not err in proceeding with the termination proceeding without transporting Father from the jail for the hearing.

### III. Appointment of Counsel

Father next claims that the juvenile court erred in not appointing counsel for him in the termination proceedings. As a result, Father contends that his due process rights were violated on this basis.

In resolving this issue, we initially observe that the right to appointment of counsel as a due process protection is not absolute. In re M.M., 733 N.E.2d 6, 9 (Ind. Ct. App. 2000). Indiana Code section 31-32-2-5 provides that a parent is entitled to representation by counsel in proceedings to terminate the parent-child relationship. However, in Baker

12

v. Marion County OFC, our Supreme Court explained that the United States Constitution does not require the appointment of counsel in every parental rights termination proceeding. 810 N.E.2d 1035, 1039 (Ind. 2004). Indiana has chosen to provide counsel in termination proceedings to all indigent parents. Id. at 1039. Indiana Code section 31-32-4-3 provides that if:

> (1) A parent in a termination of parental rights proceeding does not have an attorney who may represent the parent without a conflict of interest; and
>
> (2) The parent has not lawfully waived the parent's right to counsel under Ind. Code 31-32-5 . . . the juvenile court shall appoint counsel for the parent at the initial hearing or any earlier time.

Here, despite Father's knowledge of the hearing date of August 22, 2012, Father failed to act to secure his presence at the hearing, have counsel appointed for him, seek a continuance, or to otherwise participate in the proceedings. Father also presented no evidence to the juvenile court proving that he was indigent. Again, it appears that given the procedural history in the criminal proceedings, Father knew that he was going to ask for a continuance in that case. Appellant's App. p. 20. However, Father did not seek a continuance or take any action whatsoever in the termination proceedings. As a result, we cannot say that Father's due process rights were violated when the juvenile court did not appoint counsel to represent him in the termination proceedings.

IV. Mother's and Father's Claims—Sufficiency: Termination of Parental Rights

The Parents both argue that their parental rights should not have been terminated because the DCS failed to demonstrate that there was a reasonable probability that the

conditions resulting in the Children's removal could not be remedied. The Parents also contend that the DCS's evidence failed to establish that the continuation of the parent-child relationship posed a threat to the Children, that termination was in the Children's best interests, and that the DCS had a satisfactory plan for the care of the Children.

A. Termination of Parental Rights—Standard of Review

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to raise their children. Troxel v. Granville, 530 U.S. 57, 65 (2000); Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). But parental rights are not absolute and must be subordinated to the child's interest in determining the proper disposition of a petition to terminate parental rights. In re D.D., 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004). Thus, "parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." Id. at 265. The purpose of terminating parental rights is not to punish parents but to protect their children. In re S.P.H., 806 N.E.2d 874, 880 (Ind. Ct. App. 2004).

When reviewing the termination of parental rights, we neither reweigh the evidence nor judge the credibility of the witnesses. In re G.Y., 904 N.E.2d 1257, 1260 (Ind. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment below. Id. Here, the juvenile court made specific findings of fact and conclusions of law in its order terminating parental rights.

14

Where the juvenile court enters specific findings and conclusions, we apply a two-tiered standard of review. Bester, 839 N.E.2d at 147. We first determine whether the evidence supports the findings, and then whether the findings support the judgment. Id. We will not set aside the juvenile court's judgment unless it is clearly erroneous. In re A.A.C., 682 N.E.2d 542, 544 (Ind. Ct. App. 1997). A judgment is clearly erroneous when the evidence does not support the findings, or the findings do not support the result. In re S.F., 883 N.E.2d 830, 834 (Ind. Ct. App. 2008).

The elements that the DCS must allege and prove by clear and convincing evidence to effect the termination of parental rights are set forth in Indiana Code section 3l-35-2-4(b)(2), which provides:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

15

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

I.C. § 31-35-2-4(b)(2).

We note that Indiana Code section 31-35-2-4 (b)(2)(B) is written in the disjunctive, which requires that only one of the sub-elements, under subsection (B), be proven true by clear and convincing evidence. In re L.S., 717 N.E.2d 204, 209 (Ind. Ct. App. 1999).

### B. Reasonable Probability—Children's Removal

The Parents contend that the termination order must be set aside because the DCS failed to adequately establish that the conditions resulting in the Children's removal would not be remedied and that the continuation of the parent-child relationship poses a threat to the Children.

As noted above, because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find either that the conditions resulting in removal will not be remedied or that the continuation of the parent-child relationship poses a threat to the children. In re C.C., 788 N.E.2d 847, 854 (Ind. Ct. App. 2003). As a result, "where, as here, the [juvenile] court specifically finds that there is a reasonable

16

probability that the conditions which resulted in the removal of the [child] would not be remedied, and there is sufficient evidence in the record supporting the [juvenile] court's conclusion, it is not necessary for [DCS] to prove or for the [juvenile] court to find that the continuation of the parent-child relationship poses a threat to the [child]." In re S.P.H., 806 N.E.2d at 882.

When determining whether the conditions that led to a child's removal will not be remedied, the juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing. In re A.B., 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). However, the juvenile court's inquiry must also evaluate a parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Id.

The juvenile court may properly consider a parent's history of neglect, criminal history, failure to provide support, lack of adequate housing, and lack of employment, among other things. McBride v. Monroe Cnty. OFC, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The juvenile court may also consider the services that the DCS has offered to a parent and the response to those services. In re M.S., 898 N.E.2d 307, 311 (Ind. Ct. App. 2008). The DCS is not required to rule out all possibilities of change; rather, it need establish "only that there is a reasonable probability that the parent's behavior will not change." In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). Parental rights may be terminated when parties are unable or unwilling to meet their responsibilities. Ferbert v. Marion Cnty., OFC, 743 N.E.2d 766, 776 9Ind. Ct. App. 2001).

17

We note that in various portions of their briefs, the Parents failed to support their arguments with citations to the evidence, to any legal authority or statute, and have failed to present a cogent argument supporting their assertions as Indiana Appellate Rule 46(A)(8)(a) requires. More particularly—and contrary to the Parents' assertions—there is nothing in the record that the juvenile court somehow avoided its responsibilities in determining whether termination was in the Children's best interests or whether the conditions that resulted in their removal would be remedied. Rather, the juvenile court specifically found that termination was in the Children's best interests based on the extensive findings regarding the abuse that the Children suffered and their siblings in light of Father's conduct, Mother's unwillingness to believe the Children, and Mother's inability to protect them. Appellant's App. p. 1-4.

The evidence established that Mother did not benefit from the services that the DCS offered, particularly her therapy with Uzelac where the goal was to have Mother believe the Children's allegations against Father. Tr. p. 102-04, 120-22. As discussed above, the DCS initially became involved in the case in July 2010 when R.M. reported that Father had been sexually molesting her for the past six years and that Father had also allowed his friend, N.F., to molest her. Id. at 28-31, 39, 77. R.M. disclosed that she had informed Mother about Father's actions, but she refused to believe her. Id. at 28-31, 41-42.

Throughout the DCS's involvement in this case, Mother did not believe the Children and remained convinced that Father could not have committed these acts. Id. at

18

32, 43, 53-56, 76-77. In fact, Mother believed that there was a conspiracy against the Parents, that someone had brainwashed the Children, and that none of the allegations were true. Uzelac testified that Mother's refusal to believe the Children would devastate them and render them unable to go to her with other issues in the future. Tr. p. 107.

As noted above, Father was facing multiple criminal felony charges based on the allegations of child molesting and incest. Ex. C, G. Although Father participated in some of the services that the DCS offered, he refused to participate in sexual offender treatment. Tr. p. 73. Also, even though Mother testified that Father would move from the residence immediately, there was no evidence that he ever did. Instead, Mother's goal was to have Father released from jail to reunite the entire family. Id. at 105, 129. The evidence also established that Mother was not able to protect the Children even though she was at home. Ex. A, B.

Finally, the Parents have failed to demonstrate how that the juvenile court erred in refusing to provide the Parents with additional time to demonstrate positive progress. The evidence presented at the termination hearing showed that Mother's inability to parent the Children had not changed. Tr. p. 131-32, 154, 159, 183-85, 191-92, 256-57, 296-305, 309-10, 347-48. The juvenile court considered the evidence that was presented, and could reasonably conclude that any of Mother's recent efforts were unpersuasive because of her continued belief that Father was innocent and the Children were lying.

Finally, the Parents are attempting to have the juvenile court reweigh the evidence by alleging that Mother benefited from the DCS's services, that the juvenile court

19

"exaggerated" the facts and discounted Mother's efforts to protect the Children, and that the DCS was "never fully committed to reuniting this family."  Mother's Br. p. 7-10; Father's Br. p. 9-11.

In light of these circumstances, it is apparent to us that the Parents have failed to make any positive changes.  As a result, it was proper for the juvenile court to conclude that there was a reasonable probability that the conditions that resulted in the Children's removal would not be remedied.  Thus, we decline to disturb the juvenile court's ruling on this basis.

### C.  Best Interests

The Parents also assert that the evidence was insufficient to support the juvenile court's conclusion that terminating their parental rights was in the Children's best interest.  Mother contends that she continues to enjoy visitation with the Children "and that the Children have expressed interest and great desire in being with Mother." Mother's Br. p. 10-11.  Father claims that the Children's best interests will not be served when the Children realize "that they will no longer be a family."  Father's Br. p. 11.

In determining a child's best interests, the juvenile court is required to look beyond the factors identified by the DCS and should consider the totality of the evidence. In re J.S., 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).  The juvenile court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development are permanently impaired before terminating the parent-child relationship. In re A.A.C., 682 N.E.2d at 545.  Recommendations of the DCS case managers to

20

terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination of parental rights is in a child's best interests. J.S., 906 N.E.2d at 236.

A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same also supports a finding that termination of parental rights is in the child's best interests. Lang v. Starke Cnty. OFC, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007). The juvenile court may properly consider evidence of a parent's history of neglect, failure to provide support, and lack of adequate housing and employment. In re D.G., 702 N.E.2d at 779.

In this case, the evidence established that the Children are all receiving services through the DCS, are doing well in school and that their maternal grandmother is addressing all of their special and therapeutic needs. Tr. p. 86, 91-92. Case manager Garner believed that termination of parental rights was in the Children's best interest because of Father's abuse and Mother's continuing belief that Father is innocent, her refusal to believe the Children about the molestation incidents, and her resulting inability to provide a safe environment for them against sexual perpetrators. Id. at 86, 90. In essence, the DCS personnel believed that the Parents pose an immediate safety risk to the Children, despite their attempts to reunify them with their Children. Id. at 191-92, 256-57, 347-48.

In short, we cannot say that the juvenile court's determination that it was in the Children's best interest that the Parents' parental rights be terminated is clearly erroneous. Thus, we decline to set aside the termination order on this basis.

### D. Satisfactory Plan for the Children

Finally, Mother claims that the termination order must be set aside because the DCS failed to show that there was a satisfactory plan for the care and treatment of the Children. More particularly, Mother contends that a plan of adoption is unsatisfactory because the oldest child, R.M., "wants to be reunited with Mother, which would separate R.M. from the other children and would be detrimental to the others' mental and emotional well-being." Mother's Br. p. 11-12.

We note that a satisfactory plan for the care and treatment of the children "need not be detailed, so long as it offers a general sense of the direction in which the children will be going after the parent-child relationship is terminated." In re D.D., 804 N.E.2d 258, 268 (Ind. Ct. App. 2004). In such a case, a plan for the care and treatment of the children is satisfactory even if there is not a specific family in place to adopt the children. In re B.D.J., 728 N.E.2d at 204. An attempt to find suitable parents to adopt the children is clearly a satisfactory plan. Lang, 861 N.E.2d at 375.

In this case, the plan for the Children's care and treatment was adoption by their maternal grandmother. The DCS acknowledges that, at the time of the hearing, fifteen-year-old R.M. did not want to be adopted by the maternal grandmother and was considering a guardianship. Tr. p. 83. However, the juvenile court did not enter an order

22

terminating the parental rights as to R.M. Rather, the juvenile court's order focuses on the other Children. Moreover, Mother fails to support her argument with any evidence that the Children would not be able to see R.M. if the maternal grandmother adopted them. In short, the juvenile court did not err in concluding that the DCS had a satisfactory plan for the Children.

The judgment of the juvenile court is affirmed.

MAY, J., and MATHIAS, J., concur.